**UNITED STATES of America**

v.

**MAIN STREET DISTRIBUTORS, INC., Steven Pesce, Mark Benowitz, Arthur Eisenman, Robert Cavaliere, and Stuart Podolsky, Defendants.**

**No. 88 CR 0261.**

United States District Court, E.D. New York.

April 26, 1990.

See also, 700 F.Supp. 655.

Andrew J. Maloney, U.S. Atty., E.D. N.Y., Cheryl L. Pollak, Asst. U.S. Atty., Brooklyn, N.Y., for the U.S.

Gerald B. Lefcourt, P.C., New York City, for Main Street Distributors, Inc., and Steven Pesce; Gerald B. Lefcourt, Gary G. Becker, of counsel.

Richard Ware Levitt, New York City, for Mark Benowitz.

Jack Evzeroff, Brooklyn, N.Y., for Arthur Eisenman.

Gavin Scotti, New York City, for Robert Cavaliere.

Epstein & Kirshner, New York City, for Stuart Podolsky; Bennett M. Epstein, of counsel.

## MEMORANDUM OF DECISION AND ORDER

MISHLER, District Judge.

The court's memorandum of decision of October 4, 1989, directed an evidentiary hearing on the defendants' motion (a) to suppress physical evidence seized on March 31, 1988;[1] (2) suppression of statements made by defendants Steven Pesce, Robert Cavaliere and Stuart Podolsky; and (3) dismissal of the indictment on the ground that the government intentionally and/or recklessly submitted false testimony to the grand jury.

*Motion to Suppress the Seized Evidence*

As previously noted (in our October 4, 1989, opinion), the defendants' challenge to the validity of the search warrants issued on March 2, 1988, and March 30, 1988, based on the claim of lack of probable cause, was rejected in a memorandum of decision by Judge Raggi dated November 22, 1988.

Defendants claim that the evidence seized on March 3, 1988, and March 31, 1988, should be suppressed because the search warrants failed to particularize the premises to be searched. The warrants described the premises to be searched as "Premises Known and Described as Main Street Distributors, Inc., 40–06 Oser Avenue, Hauppauge, New York." The affidavit, by Special Agent Anthony Giattino, in support of the warrant issued on March 30, 1988, stated:

The Premises occupy a single-floor at 40–06 Oser Avenue in an industrial park in Hauppauge. The greater part of the space at that address consists of a warehouse area containing rows of free-standing metal shelving; also occupying space at that location is an office area at front of the building.

Defendants argue that 40–06 Oser Avenue is not occupied by Main Street Distributors, Inc. ("Main St."), alone but is a multi-unit building which is also occupied by OMT Distributors ("OMT") and other businesses.

Defendants urge that the evidence seized on March 31, 1988, be suppressed because of the conduct of the law enforcement officers in executing the warrant on that day.

The hearing established the following facts:

In January 1988, a Customs Inspector stationed in Port Newark, New Jersey, advised Import Specialist John Barry that a shipment believed to be glass crack pipes known as "stems" had arrived at the Railhead Terminal in Port Newark. Barry advised Special Agent Anthony Giattino of this conversation. Barry and Giattino examined the shipping documents at the terminal and learned that the shipment consisted of 500,000 four-inch glass stems consigned to Freedom Imports, 872 Broadway, New York. Barry interviewed Alain Elkaim, the president of Freedom Imports, and learned that part of the shipment was destined for Main Street.

In April 1987, Barry had visited Main Street to investigate a complaint of the Mini–Grip Corporation, the owner of patents and trademarks for "ziplock" plastic bags which were the subject of a patent exclusion order. When he entered the premises at 40–06 Oser Avenue he noticed a sign with the names Main Street Distributors, Butco, Strike–A–Light, and OMT Distributors on the entrance door.

Barry discussed the complaint with Donna Ferraro, office manager for Main Street. In response to Barry's inquiry as to whether Main Street imported other merchandise, Ferraro stated that Butco had imported brass screens for pipe filters and that Butco and Main Street were the same company doing business under different names. Defendant Arthur Eisenman entered the conference room where the interview was being held and indicated he knew of the complaint filed by Mini–Grip.

---

1. The motion was directed to the seizure on March 31, 1988. The hearing included evidence of the March 3, 1988, search and seizure. This memorandum assumes both searches are the subject of the motion.

Barry observed nothing in the premises to indicate that any individual or entity other than Main Street occupied any part of the building.

Giattino had a basis for believing that Main Street was in the business of distributing drug paraphernalia from the premises at 40–06 Oser Avenue. In February 1988, he assigned Special Agent Gary Kiernan to conduct a surveillance of the premises. Kiernan noticed a roof sign on the building which read "40–06 Main Street." No sign described the premises as 40–06 Oser Avenue. The building is located in an industrial park. 40–06 Oser Avenue is the address of a building with party walls on both sides, indicating the use or potential use by firms unrelated to Main Street. In the rear of 40–06 Oser Avenue is a parking area, also a loading dock for Main Street's warehouse portion of the premises. Giattino learned from the utility companies that Main Street paid the bill for all utilities to the building.

*Execution of the March 2, 1988, Search Warrant*

Special Agent Ray Barrett was the lead agent in the execution of the warrant on March 3, 1988. Barrett entered the premises with other law enforcement officers at about 1:00 p.m. and exhibited the warrant to the receptionist. He was advised that the owner (previously identified through a Dun and Bradstreet report as Steven Pesce) was not present. About 15 minutes after entering, while agents were conducting a security sweep, Stuart Podolsky pointed to an area in the warehouse consisting of a room which had an open front gate and stated that the area was used by his company, which was engaged in printing emblems on shirts. Pesce arrived at about 2:30 p.m. and told Barrett that some office space was leased to Mark Benowitz and Podolsky. No signs were displayed nor was there any indication, other than Pesce's and Podolsky's statements, that any space in the premises was occupied by any individual or entity other than Main Street. In one of the offices (either A or

B), there was a desk with a sign which stated "Steven Pesce, President."

After consulting by telephone with an Assistant United States Attorney for the Southern District of New York, offices D and E were not searched; items in the warehouse area which Podolsky claimed to be his were not seized since they were not the subject of the search.

The agents seized the contraband they found in the warehouse. They also seized Main Street records. Among the records seized was a letter addressed to "Mr. Stuart Podolsky, Main Street Distributors" (Ex. S–11) and a letter addressed to "Mark Benowitz, Import Director, Main Street Dist., Inc." (Ex. S–12).

*Execution of the March 30, 1988, Search Warrant*

Giattino led a team of law enforcement officers in executing the search warrant on March 31, 1988. He exhibited the search warrant to Ferraro. In answer to Giattino's question as to who was in charge, she stated that she had five bosses: Pesce, Benowitz, Cavaliere, Podolsky and Eisenman—all partners.

Giattino asked Cavaliere, Podolsky and Benowitz what interest they had in Main Street. Cavaliere said he had nothing to do with Main Street; he said he operated a jewelry business under the trade name Golden Opportunities.[2] Podolsky denied any relationship with Main Street; he stated he operated OMT Distributors, which occupied office space in the premises. Benowitz stated that he occupied an office in the premises separate and apart from the premises occupied by Main Street.

The agents seized a Main Street record entitled "Corporate Books File Sign Out Corp. Book Sheet" with the following instruction:

IF ANYONE (PARTNERS OR OTHER) TAKE A CORP. BK. PLS SIGN ENCLSD.

The attachment to the instruction sheet dated March 12, 1987, listed 18 corporations (including Main Street and Golden Opportunity Redemption Ctr., Inc.). It not-

---

2. Golden Opportunities was one of Main Street's    retail operations.

ed "Assorted Corporate Seals in Main Street's (Steve's office) Safe."

During the security sweep agents saw drug paraphernalia and catalogs pertaining to drug paraphernalia in the office Benowitz and Podolsky claimed they used for the separate business conducted under the name OMT Distributors, Inc. (Office D). After discussing the claim made by Benowitz and Podolsky with an Assistant United States Attorney for the Eastern District of New York, and the assistant having authorized a search of that office (Office D), the agents conducted the search.

## DISCUSSION RE SUPPRESSION

The Fourth Amendment, in prohibiting general searches, directs that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched...."

A warrant complies with the particularization requirement of the Fourth Amendment if the officers executing the warrant can "with reasonable effort ascertain and identify the place intended." *Steele v. United States,* 267 U.S. 498, 503, 45 S.Ct. 414, 416, 69 L.Ed. 757 (1925). *See United States v. Ofshe,* 817 F.2d 1508, 1514 (11th Cir.), *cert. denied,* 484 U.S. 963, 108 S.Ct. 451, 98 L.Ed.2d 391 (1987) (Search of multi-unit building upheld where warrant authorized search of a single business. Officers had no reason to know that the premises were subdivided into separate offices.); *Marvin v. United States,* 732 F.2d 669, 673 (8th Cir.1984) (Search of private apartments upheld where the warrant authorized the search of a clinic because the officers did not know or could not reasonably have been expected to know the multi-unit character of the building); *United States v. Gonzalez,* 697 F.2d 155, 156 (6th Cir.1983) (Defendants moved between units of a building. Warrant authorizing the search of the entire building upheld.).

■ Where a structure contains a number of business entities, all controlled by a single individual or entity, a warrant authorizing a search of the single structure will be sustained. In *United States v. Gilman,* 684 F.2d 616, 618 (9th Cir.1982), the court held:

> The general rule voiding the warrant for an undisclosed multiunit structure ... does not apply if the defendant was in control of the whole premises or they were occupied in common, if the entire premises were suspect, or if the multiunit character of the premises was not known to the officers.

*See also National City Trading Corp. v. United States,* 635 F.2d 1020, 1026 (2d Cir.1980); *United States v. Busk,* 693 F.2d 28 (3rd Cir.1982).

We find that no statement made to the magistrate in the affidavit upon which the warrant was issued on March 2, 1988, or March 30, 1988, which was material to the issue of probable cause or description of the premises to be searched, was false when made. *See Franks v. Delaware,* 438 U.S. 154, 155, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978); *United States v. Karo,* 468 U.S. 705, 721, 104 S.Ct. 3296, 3306, 82 L.Ed.2d 530 (1984); *United States v. Levasseur,* 816 F.2d 37, 43–44 (2d Cir.1987); *United States v. Malsom,* 779 F.2d 1228, 1236 (7th Cir.1985).

■ The government challenges the standing of Benowitz, Podolsky and Cavaliere to seek suppression of the items seized in the searches. Benowitz and Podolsky occupied one office, which they describe as an OMT Distributors office, and Cavaliere occupied another office. In addition, Benowitz and Podolsky claim an expectation of privacy in another office, namely the office used in the business affairs of OMT, occupied by its employee Christine Hrivnak. The office occupied by Benowitz and Podolsky was not in any way designated as an OMT office. The office occupied by Ms. Hrivnak contained file cabinets in which were OMT Distributors documents. (Ms. Hrivnak testified that the door to that office was usually "locked" and had the letters OMT on it.) Cavaliere claims an expectation of privacy in the office he occupied based on his position as president and secretary of Philex Enterprises, a corpora-

tion which collected rents from OMT retail outlets.

These offices were used in the business of Main Street. The office occupied by Ms. Hrivnak contained 12 to 15 corporate kits, or black beauties, including, at one time, the Main Street kit.[3] In addition to selling T-shirts, lingerie and other legitimate items, OMT retail outlets sold drug paraphernalia purchased by Main Street and distributed to retailers, including OMT. The office occupied by Benowitz and Podolsky contained two desks and chairs and a filing cabinet. In executing the March 30, 1988, warrant, agents seized numerous drug paraphernalia catalogs from Benowitz and Podolsky's office.[4]

OMT was Main Street's retail sales organization for drug paraphernalia.

We find that the entire premises known as 40–06 Oser Avenue was under the complete control of the defendant Main Street Distributors, Inc. It follows that defendants' claim of improper conduct on the part of the law enforcement officers in that they "showed a flagrant disregard of defendants' rights" is rejected.

We note the observation the Supreme Court made in *Maryland v. Garrison*, 480 U.S. 79, 87, 107 S.Ct. 1013, 1018, 94 L.Ed.2d 72 (1987): "The court has ... recognized the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants."

The search conducted on March 3, 1988, pursuant to the warrant issued on March 2, 1988, and the search conducted on March 31, 1988, pursuant to the warrant issued on March 30, 1988, were lawful searches as were the seizures.

The motion to suppress is denied.[5]

---

**3.** The corporate file sign-out sheet indicated that the Main Street books were located "in Chris's office, to stay there as per Stu." Exhib. S–17. This typed notation was followed by a handwritten notation "7/20 Kirschenbaum has in his office." *Id.* "Chris" is Christine Hrivnak; "Stu" is Stuart Podolsky; "Kirschenbaum" is an attorney.

**4.** On Benowitz's desk were Funky Enterprises and Nalpac, Ltd., catalogs, which offered for sale various pipes (stone, glass carb, hash oil,

*Statements of Pesce, Cavaliere and Podolsky*

*Pesce Statements*

■ On March 3, 1988, Pesce arrived at the Main Street offices about one hour after the agents had entered the building. Detective Dennis Wustenhoff was checking the racks of merchandise at the time. Pesce was not under arrest. Pesce made several statements to Wustenhoff while the latter was making the examination. The statements were knowingly and voluntarily made. The statements are admissible in evidence.

■ On March 31, 1988, Pesce came to the Main Street offices about 40 minutes after the search had started. Special Agent Peter Angelino arrested Pesce on an arrest warrant issued the previous day. Angelino read Pesce his rights and warnings under *Miranda* in the presence of Special Agents Giattino and Gary Kiernan. Pesce advised the agents that he would not waive any constitutional rights. Kiernan placed Pesce in handcuffs, and he and Angelino placed Pesce in a vehicle to be transported to the World Trade Center for processing.

Having indicated that he wished to stand on his Fifth Amendment constitutional right to remain silent, the agents were bound to scrupulously honor that assertion. *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975). Pesce, seated in the back of the vehicle (still handcuffed), asked why he was arrested. Kiernan advised Pesce he was arrested "for trafficking in drug paraphernalia." Pesce boasted that he "beat this in Suffolk County and I can beat it again." Kiernan

---

and others) bongs, scales, Butane table lighters, Butane torches, stash boxes, etc. On Podolsky's desk were Sante Fe Stoneworks and Rana–Pipien Enterprises catalogs. Rana–Pipien was a predecessor corporation to Main Street. Also in the office were Adam's Apple, Microtorch, and other Rana–Pipien catalogs.

**5.** Benowitz, Podolsky and Cavaliere made a showing of the expectation of privacy for the purpose of establishing standing to challenge the searches of their offices.

then asked what Pesce meant by "beat this." Pesce's statement tended to incriminate him on the issue of knowledge.

Kiernan then showed Pesce a pedigree sheet. While asking routine questions concerning name, address, type of work, etc., Pesce said, "You don't like me, do you?" Kiernan replied, "It's not that I don't like you. I don't like what you are doing." In response to Pesce's further question as to what he was doing, Kiernan said, "You are selling drug paraphernalia." Again, in answer to Pesce's question "What drug paraphernalia?", Kiernan described some of the items claimed to be drug paraphernalia seized at Main Street. Pesce's response tended to incriminate. Finally the exchange with Pesce reached a point at which Pesce refused to answer any more questions, including those on the pedigree sheet, until he talked with his lawyer.

In *Arizona v. Mauro*, 481 U.S. 520, 523, 107 S.Ct. 1931, 1935, 95 L.Ed.2d 458 (1987) the Court, citing *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), stated:

> [T]he *Innis* Court concluded that the goals of the *Miranda* safeguards could be effectuated if those safeguards extended not only to express questioning, but also to "its functional equivalent." 446 U.S., at 301, 100 S.Ct., at 1689. The Court explained the phrase "functional equivalent" of interrogation as including "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Ibid.* (footnotes omitted). Finally, it noted that "[t]he latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Ibid.*

*See Anderson v. Smith*, 751 F.2d 96, 102–03 (2d Cir.1984).

We find the statements made by Pesce in the vehicle while being transported to the World Trade Center on March 31, 1988, were made in response to questions or their functional equivalent.

The statements are suppressed.

## Statements of Podolsky and Cavaliere

■ We understand that Podolsky and Cavaliere challenge the admissibility of the statements made by them during the March 31, 1988, search on the theory that they were made during interrogation while in custody or its functional equivalent, citing *Innis, supra*.

Upon entering the premises on March 31, 1988, the agents conducted a security sweep. The employees were directed to the luncheon area while the agents searched the racks. The employees were not otherwise restrained during this period of the search. During this period—the first 30 to 45 minutes of the search—Giattino spoke with Podolsky, Cavaliere, Benowitz and employees of Main Street.[6] Giattino asked Podolsky what his relationship with Main Street was. Podolsky replied that he had no relationship with Main Street and that he operated a separate business, OMT Distributors, which had. offices in the rear area of the office space at 40–06 Oser Avenue. Cavaliere responded to Giattino's question in a similar manner, stating that he operated Golden Opportunities; he pointed to his office space (Office E). Both Podolsky and Cavaliere returned to their offices after this brief questioning.

We find that the statements were not made while in custody or its functional equivalent. The statements were knowingly and voluntarily made.

The motion to suppress the statements made by Podolsky and Cavaliere on March 31, 1988, during the search of the Main Street premises, is denied.

## Testimony Presented to the Grand Jury

Defendants claim that the manner of presenting items seized, and the testimony concerning those items, was false and presented to the grand jury by the prosecutor recklessly or with knowledge that it was false.

Defendants allege that a law enforcement officer testified before the grand jury

---

**6.** Benowitz does not seek suppression of his    statements.

to the effect that snuff was not inhaled but, rather, placed between cheek and gum. Defendants state that this is not true and, therefore, that the testimony of the officer misled the grand jury and caused it to return an indictment which it otherwise would not have.

Also, defendants allege that evidence was altered before it was presented to the grand jury. Defendants claim that the government—prosecutor(s) and/or law enforcement agents—inserted screens into glass stems to to create "crack" pipes. Defendant states that this item—the stem with the screen inserted—was not carried in its warehouse or sold by any of its retail establishments.

## DISCUSSION RE ALLEGED GRAND JURY IMPROPRIETIES

■ A trial court may exercise its supervisory power to dismiss an indictment "to prevent prosecutorial impairment of the grand jury's independent role." *United States v. Hogan,* 712 F.2d 757, 761 (2d Cir.1983). Dismissal is a drastic remedy and thus is rarely used. *United States v. Dyman,* 739 F.2d 762, 768 (2d Cir.1984), *cert. denied,* 469 U.S. 1193, 105 S.Ct. 969, 83 L.Ed.2d 973 (1985). Absent proof of government misconduct, the misleading testimony of a witness is not enough to require dismissal of an indictment. *See Bank of Nova Scotia v. United States,* 487 U.S. 250, 257, 108 S.Ct. 2369, 2377, 101 L.Ed.2d 228 (1988) (that false or misleading summaries were given to a grand jury by IRS agents does not provide grounds for dismissing an indictment unless it is shown that there was prosecutorial misconduct).

■ Furthermore, evidence considered by the grand jury, which evidence is later learned to be fraudulent, will not invalidate an indictment if there is otherwise competent evidence to support it. *United States v. Adamo,* 742 F.2d 927, 941–42 (6th Cir. 1984), *cert. denied,* 469 U.S. 1193, 105 S.Ct. 971, 83 L.Ed.2d 975 (1985). *Cf. United States v. Estes,* 793 F.2d 465, 466–67 (2d Cir.1986) (where there is sufficient competent evidence to establish probable cause, the mere fact that some incompetent evidence was received by a grand jury does not invalidate an indictment).

*Testimony of the Officer*

■ The statements of the law enforcement officer, to the effect that snuff is not snorted up the nose but placed between cheek and gum, are not false but could be denominated as misleading. There is a type of snuff, also known as "snoose" or "chew," which is placed between cheek and gum. However, this is not the only type of snuff. There is another kind of snuff, albeit less common, which is snorted up the nose. Several employees of defendants who appeared as witnesses before the grand jury testified that snuff was inhaled. For example, one witness explained how the "snuff bullet" was used:

> There is a—inside the bullet head, inside the plastic piece, there is a valve. In the valve, I guess, there is a little chamber. You turn the chamber to this side so that it would open, turn the piece upside down. I guess, tap it and turn the valve up so that it faced the top and then they would inhale the snuff.

> Q. Is it your testimony that people would actually use that to inhale snuff?

> A. I've never seen the piece being used. I assumed it was being used for snuff.

(Tr. of Grand Jury testimony of Witness Y, at 13–14)

In response to the question "[W]hat was your understanding as to how that bullet snuff inhaler was actually to be used?", the witness said:

> Well, my customers would never ask me for anything but a snuff bullet. I guess on a personal basis, I couldn't document by talking to my customers, but the bullet could have been used for use with illegal substances.

> Q. Such as any particular illegal substance that you might be aware of?

> A. Cocaine.

*Id.* at 19.

This witness also testified that snuff tobacco was placed in what were called "snuff kits."

Later the Assistant United States Attorney asked this witness how a vial and spoon (Grand Jury Exhibit G) were used:

A. The vial would be full and the spoon would be used to pick up the snuff and it would be inhaled.

*Id.* at 22.

The assistant asked the witness, "Is there any doubt in your mind as to the type of product that was actually to be snorted by means of that flip top device [exhibit G]?" The witness answered:

Basically the way the snuff is and the way the vial and spoon are together, I think, it would be difficult for somebody to—to inhale the type of snuff that we are supplying.

*Id.* at 23.

Other witnesses gave testimony to this same effect. It is fair to assume that the grand jury concluded the products sold by defendants were not intended by defendants to be used with snuff. Indeed, the grand jury could have returned an indictment independent of the testimony by the law enforcement officer by merely examining the evidence seized—snuff bullets, scales that weighed in grams, hemostats, water pipes, mannite (a baby laxative which is also used as a cocaine cutting agent), *inter alia.* The grand jury may well have concluded that such items were being sold together only because defendants intended the items to be used as drug paraphernalia and not for their other legitimate purposes.

■ Therefore, we find that the testimony of the law enforcement officer did not bias the grand jury; there was sufficient other evidence upon which the jury could have based its indictment. So long as the evidence presented to a legally constituted and unbiased grand jury provides a basis for indictment, a trial court will not exercise its supervisory power to dismiss the indictment. *See Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 408–09, 100 L.Ed. 397 (1956) (no challenge can be made to the sufficiency or competency of evidence presented to an unbiased grand jury; indictment based on hearsay evidence is valid); *United States v. Casamento,* 887 F.2d 1141, 1182 (2d Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990) (facially valid indictment cannot be challenged on the ground it is based on inadequate evidence).

*Glass Stems*

Regarding the glass stems which were displayed to the grand jury with screens inserted, our *in camera* inspection of the grand jury transcripts reveals that the glass stems were seized in that form. Although the witnesses who were employees of defendants claimed not to have seen stems with screens inserted in the warehouse, these disclaimers do not provide proof of prosecutorial misconduct.

■ Furthermore, even if the agents who had seized the evidence inserted the screens after the initial seizure, this alone does not invalidate the indictment. The prosecutor must have knowledge of the tampering before the evidence is presented to the grand jury, or there must be a showing of other prosecutorial misconduct, before an indictment will be dismissed by a trial court. *Bank of Nova Scotia v. United States,* 487 U.S. 250, 257, 108 S.Ct. 2369, 2377, 101 L.Ed.2d 228 (1988). "[T]he mere fact that evidence itself is unreliable is not sufficient to require a dismissal of an indictment." *Id.*

We deny defendants' motion to dismiss the indictment on the ground of grand jury improprieties. We find the grand jury had probable cause to believe that defendants were offering for sale or transportation in interstate commerce numerous items to be used as drug paraphernalia.

ORDER

The motion to suppress the physical evidence seized at 40–06 Oser Avenue on March 3, 1988, and March 31, 1988, is in all respects denied.

The motion to suppress Pesce's statements on March 31, 1988, while he was in custody in a vehicle to the World Trade Center is granted; the motion to suppress the statements made on March 3, 1988, is denied.

The motion to suppress the statements made by Podolsky and Cavaliere is denied.

The motion to dismiss the indictment for improprieties in the method of presenting evidence to the grand jury is denied.

SO ORDERED.