**UNITED STATES of America**

v.

**Orlando PEREZ and Teddy Ramos, Defendants.**

**No. 96 Cr. 167 (RWS).**

United States District Court,
S.D. New York.

Nov. 27, 1996.

Mary Jo White, United States Attorney for the Southern District of New York, New York City, for United States of America (Alexandra A.E. Shapiro, Steven M. Cohen, and Richard B. Zabel, Assistant U.S. Attorneys, of counsel).

Michael Young, New York City, for Defendant Orlando Perez.

Morvillo, Abramowitz, Grand, Iason & Silberberg, New York City, for Defendant Teddy Ramos (Robert J. Anello and Christopher J. Gunther, of counsel).

## OPINION

SWEET, District Judge.

Defendants Teddy Ramos ("Ramos") and Orlando Perez ("Perez") have moved to suppress evidence against them. For the reasons set forth below, Ramos' motion will be granted and Perez's motion will be denied.

### Prior Proceedings

The prior proceedings in this action have been fully set forth in a prior Opinion of this court, dated September 6, 1996, familiarity with which is assumed. Those proceedings relevant to the instant motion are described below.

The eight count indictment, S1 96 Cr. 167, handed down on March 29, 1996, charges Perez with participating in and conspiring to participate in a racketeering enterprise, the Almighty Latin King Queen Nation (the "Latin Kings"), through a pattern of racketeering activity, in violation of Title 18, United States Code, Sections 1961 and 1962(c) and (d) ("RICO"). Ramos is jointly charged in Counts Three, Four, and Seven of the indictment.[1]

On June 13, 1996, Ramos moved (1) to dismiss Counts Three, Four and Seven of the indictment on the grounds that the enactment of Section 1959 exceeded Congress' authority to regulate interstate commerce; (2) pursuant to Fed.R.Crim.P. 18 to dismiss those counts for improper venue; (3) pursuant to Fed.R.Crim.P. 14 to sever those counts; (4) pursuant to Fed.R.Crim.P. 12(b)(3) to suppress Ramos' post-arrest statement, or seeking a hearing regarding the circumstances under which the statement was made; (5) pursuant to Fed.R.Crim.P. 7(f) to compel the Government to provide a bill of particulars; and (6) to compel the Government to provide immediate access to *Brady* and *Giglio* material, to provide a list of Government witnesses, and to disclose evi-

---

1. Count One of the indictment charges Perez with a substantive RICO violation predicated on the murder of Benjamin Quinones ("Quinones") and attempted murder of Michael Irizarry ("Irizarry"); Count Two charges Perez with a RICO conspiracy violation grounded on those same acts; Count Three charges Perez and Ramos with conspiring to murder Quinones in violation of 18 U.S.C. Section 1959 ("Section 1959") (a)(5); Count Four charges both defendants with

the murder of Quinones in violation of Section 1959(a)(1); Count Five charges Perez with conspiracy to murder Irizarry; Count Six charges Perez with an attempt to murder Irizarry; Count Seven charges Perez and Ramos with using a firearm during the Quinones murder in violation of 18 U.S.C. Section 924(c); Count Eight charges that Perez used a firearm during the attempt to murder Irizarry.

dence of other crimes pursuant to Fed. R.Evid. 404(b).

On June 13, 1996, Perez moved: (1) to suppress his post-arrest statements on the ground that they were obtained in violation of the Fifth and Sixth Amendment; (2) to suppress the fruits of the Government's search of Perez's room in his father's apartment on the grounds that the search was conducted in violation of the Fourth Amendment; (3) to suppress tape recordings of telephone conversations between Perez and various inmates of the Metropolitan Correction Center ("MCC") on the grounds that the interception violated the Fourth, Fifth and Sixth Amendments; (4) to preclude the Government from introducing Perez's prior record at trial; and (5) to compel the Government to provide Perez with discovery and particulars concerning the charges.

By Opinion dated September 6, 1996, this Court denied Ramos' and Perez's motions in part as set forth therein, and held that a hearing would be required to determine whether Ramos' statements and the fruits of the warrantless search of Perez's room would be admissible.

From September 17 to September 19, 1996, the Court held a hearing regarding the admissibility of Ramos' post-arrest statements and the fruits of the warrantless search of Perez's room in his father's apartment. Post-hearing briefs were submitted on October 28, 1996, at which time the motions to suppress were considered fully submitted.

*Facts*

### I. *Ramos' Post–Arrest Statements*

The evidence at the suppression hearing established the following relevant facts. On March 29, 1996, at approximately 8:40 a.m., Special Agent Vincent Sullivan ("Agent Sullivan") of the Federal Bureau of Investigation ("FBI") arrested Ramos in front of 250 East 112th Street, New York, New York. A federal arrest warrant had been issued on March 13, 1996 pursuant to a sealed indictment charging Ramos with murder in aid of racketeering (18 U.S.C. § 1959(a)(1)), conspiracy to commit such a murder (18 U.S.C.

§ 1959(a)(2)), and a possession of gun during such a murder (18 U.S.C. § 924(c)).

Agent Sullivan was the first officer to reach Ramos and put on the handcuffs. New York City Police Detective Angelo Cioffi ("Detective Cioffi") and Special Agent Theresa Meehan ("Agent Meehan") arrived just after Agent Sullivan. Upon his arrest, Ramos immediately asked what the charges were. Agent Sullivan replied that "it had to do with his membership in the Latin Kings." Ramos then stated: "It can't be me, I just got out, you have the wrong guy." Agent Sullivan identified himself as an FBI agent and reiterated that the arrest "ha[d] to do with the Latin Kings." Ramos was not told that he was being arrested on a racketeering and murder charge, or shown the warrant for his arrest.

After Ramos was arrested, Agent Sullivan and Detective Cioffi walked him to an automobile that was used to transport him to FBI headquarters at 26 Federal Plaza in Manhattan. Prior to leaving the scene for FBI headquarters, at approximately 8:45 am, Agent Sullivan orally advised Ramos of his *Miranda* rights. Detective Cioffi and New York City Police Detective Dexter Hanora accompanied Agent Sullivan and Ramos in the car ride to FBI headquarters. Ramos said nothing during the seventy-minute drive.

At approximately 10:05 am, after arriving at FBI headquarters, Agent Sullivan and Detective Cioffi transported Ramos to an interview room on the 28th floor of the Headquarters. They removed Ramos' handcuffs from behind his back and handcuffed him to a railing. Agent Sullivan then took Ramos' pedigree information and recorded that information on an FBI form.

After the pedigree information was taken, Agent Sullivan read the advice of rights form aloud and had Ramos read it back to him. Ramos then requested counsel, and again asked about the charges underlying the arrest. Agent Sullivan responded by again telling Ramos that "it had to do with his membership and activities in a gang known as the Latin Kings" and added, "we know you are a Latin King." Ramos then stated that he was no longer a member of the Latin Kings and had last been with them in 1993.

From 10:45 to 10:50 a.m., Agent Sullivan attempted to elicit a confession or assistance in the investigation. Ramos responded that he did not want to talk.

## II. *The Search of Perez's Father's Apartment*

The evidence at the suppression hearing established that on March 15, 1996, at approximately 5:30 am, 10 to 15 FBI agents and New York City Police Detectives went to 2150 Creston Avenue in the Bronx to execute an arrest warrant for Orlando Perez. One group of officers went to Apartment 3C and another group went to Apartment 4H. The group that went to Apartment 4H knocked on the door and announced "police" or "FBI." A few minutes later, the door was opened by Jaime Ortiz ("Ortiz"), Perez's father. Ortiz informed the officers that his son was not present and had left town the previous day.

With their guns drawn, the officers entered the apartment without asking Ortiz's permission and conducted a "security sweep," looking for Perez in all rooms and closets and confirming that he was not in the apartment. The agents holstered their guns upon completion of the sweep, and no agent had his or her gun drawn after that point.

Agent Meehan, who entered the apartment immediately after the "entry team" members who conducted the sweep of the apartment, spoke to Ortiz about his son's whereabouts. Ortiz informed Agent Meehan that he believed that the defendant had gone upstate and might be staying with Ortiz's mother or an aunt.

In response to questioning by Agent Meehan, Ortiz stated that the defendant had taken with him a flowered bag that was part of a matched luggage set, and Agent Meehan asked if she could see what the luggage looked like. Ortiz went into the defendant's bedroom with Agent Meehan and another agent, took a flowered bag out of the closet, and showed it to the agents.

While Ortiz was retrieving the luggage from the bedroom closet, the agent with Agent Meehan noticed some Latin King-re-

lated documents lying on top of a closed green storage bin in the bottom of the armoire next to the closet, and called this to Agent Meehan's attention. The agents then discussed in Ortiz's presence whether to obtain a warrant to search the apartment.

Agent Meehan asked Ortiz for permission to search the apartment, and informed him that she would like to try to get a search warrant but indicated that would take some time and that it would be faster if he were to consent. In response to questioning by Agent Meehan, Ortiz stated that he rented the apartment and was the sole named tenant on the lease; that his son did not pay rent to him; and that Ortiz had access to his son's bedroom.

At the hearing, Ortiz testified that the bedroom was solely his son's bedroom, that no one else lived in that bedroom with Perez, that Ortiz never used that bedroom for any purpose and that Ortiz never stored anything in that room. Ortiz further testified that he would never have gone through the items which Perez had in that room because they were his son's personal and private belongings. He also explained that although his son did not pay rent, he did contribute to the household expenses whenever he could.

The door to the defendant's bedroom was not locked. Agent Meehan testified that, based on Ortiz's responses to her questions and the fact that the bedroom door could not lock, she believed that Ortiz had the authority to consent to the search and requested his consent. Ortiz testified that when he walked past Perez's bedroom on his way to answer the front door, the bedroom door was closed because Perez was out of town at the time. Each of the four officers on the "entry team" later stated that he had not been the first to enter defendant Orlando Perez's bedroom. Consequently, none could state for certain whether the doors to the closet and the armoire in Perez's bedroom had been closed prior to their entry. Ortiz testified that Perez normally kept the doors to the armoire tied closed with a strip of black cloth and the closet door locked with a padlock on a hasp.[2]

---

**2.** At the suppression hearing, Agent Meehan tes-    tified that there was no hasp on the closet door

According to the agents' testimony, there were no locks on the closet or armoire at the time of the search, and the closet was not locked prior to the agents' entry into the apartment.

Ortiz agreed to consent to the search, and Special Agent Kathleen Arthurs read him a standard FBI consent to search form. The form states:

> I, Jaime Ortiz, having been informed of my constitutional right not to have a search made of the premises hereinafter mentioned without a search warrant and of my right to refuse to consent to such a search, hereby authorize Teresa M. Meehan, and Kathleen Arthurs, Special Agents of the Federal Bureau of Investigation, United States Department of Justice, to conduct a complete search of my premises located at 2150 Creston Ave. #4H Bronx, NY. These agents are authorized by me to take from my premises any letters, papers, materials or other property which they may desire.
>
> This written permission is being given by me to the above-named Special Agents voluntarily and without threats or promises of any kind.

Ortiz agreed to consent to the search and signed the FBI form. He testified that he read the form before he signed it.

Several agents then conducted a detailed search of the Perez's bedroom, seizing items from inside the closet and the armoire, including items stored inside the green storage bins found inside the armoire and items hidden between the mattress and box springs of Perez's bed. Among the items seized were documents relating to the Latin Kings, collection of dues, a poster and a jacket with the Latin Kings insignia, a box of cassette tapes, and Latin King identification cards.

Agent Frank Schulte took photographs before, during, and after the search. When the search was completed, Agent Meehan wrote out a receipt listing all the items to be seized. Ortiz reviewed the list, asked several questions and signed each page of the receipt. He acknowledged that he understood what was happening and didn't object to the seizure of the items. The agents testified as to their belief that Ortiz's consent extended to the items in the green storage bins.

Ortiz testified that at the time of the search, he was depressed due to the recent deaths of his wife and his mother-in-law, and that he was suffering from severe diabetes, as a result of which his weight had dropped from 185 to 118 pounds. He was on medication, had trouble sleeping and was suffering extensively from the effects of the diabetes. Ortiz testified that while the agents were in his home, he was frightened, confused and not thinking clearly. He testified that he believed that he had no choice as to whether to consent, because a search warrant would be obtained if he did not consent.

### *Discussion*

### I. *Ramos' Statement Will Be Suppressed*

Ramos contends that his statement that he was no longer in the Latin Kings and had left them in 1993 should be suppressed because it was elicited in violation of his *Miranda* and Sixth Amendment rights. He contends that he made the statement after declining to speak and invoking the right to counsel and that the statement was the product of custodial interrogation.

As set forth above the statement at issue was made after Ramos had declined to speak and invoked his Sixth Amendment right to counsel.[3] Detective Cioffi's recollection is supported by his DD–5 report, prepared the

---

in Perez's bedroom, and that the defense photo of a door with a hasp was not a photo of the closet door in Perez's bedroom. Agent Arthurs gave similar testimony on this subject.

At the defense's request, the Government provided an expanded copy of one of its own photos of the bedroom which confirmed that there had been a hasp on the closet door on the day the agents searched it. Consequently, the Government conceded that the photo originally provided

to the defense was not complete and that the agents' testimony that there was no hasp on the closet door had been incorrect.

**3.** The Government does not contend that Agent Sullivan was correct when he testified that Ramos' statement was made before he declined to speak. Instead, the Government's position is that because there was no interrogation, the timing of Ramos' statement is irrelevant.

day of the arrest, which recounts the same sequence of events to which he testified:

> Mr. Ramos was read his rights, stating he would want a Lawyer, Mr. Ramos also stated that he "left them in 1993" and "not part of them" when told of his charges, by Agent Vince Sullivan.

■ Because Ramos had been indicted and had invoked his right to counsel and to remain silent when the statement at issue was made, both the Fifth and Sixth Amendments guaranteed his right to counsel at custodial interrogations. *See Michigan v. Jackson,* 475 U.S. 625, 629, 106 S.Ct. 1404, 1407, 89 L.Ed.2d 631 (1986); *United States v. Mohabir,* 624 F.2d 1140, 1146 (2d Cir.1980); *Miranda v. Arizona,* 384 U.S. 436, 473, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1966). Upon Ramos' indication that he wished to stand on his rights, the agents were bound to "scrupulously honor" that assertion. *See Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). These protections only apply, however, to statements elicited by law enforcement officers through interrogation. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966) (barring the use of "statements ... stemming from custodial interrogation of the defendant" where warnings not given prior to interrogation); *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (spontaneous statements, which are not the product of custodial interrogation, are not subject to suppression). Thus, the Government is not prohibited from introducing a defendant's spontaneous post-arrest statements.

■ Moreover, when an arrestee who has been advised of his *Miranda* rights initially declines to answer questions or requests an attorney, but later initiates a conversation with law enforcement officers, even statements made in response to subsequent interrogation are admissible. *See Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981) (officers may interrogate arrestee who has asked for a lawyer, so long as the arrestee "himself initiates further communication, exchanges or conversations with the police"). However, "if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Smith v. Illinois* 469 U.S. 91, 95, 105 S.Ct. 490, 493, 83 L.Ed.2d 488 (1984); *see Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). However, where the defendant has been indicted, the Government must satisfy a "higher standard" to meet the "heavy burden" of showing a valid waiver of the Sixth Amendment right to counsel. *See Mohabir,* 624 F.2d at 1148.

Thus, the questions presented here are: (1) Did the exchange between Agent Sullivan and Ramos constitute an interrogation, and (2) if so, had Ramos knowingly and intelligently waived his rights by initiating discussions after having invoked those rights.

■ Ramos contends that Agent Sullivan's repeated refusal to specifically identify the charges against Ramos, and Agent Sullivan's statement "we know you are a Latin King" constituted the functional equivalent of "interrogation." In *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court defined "interrogation" quite broadly to include:

> words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect.[4] The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.... A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.

*Id.* at 301, 100 S.Ct. at 1689–90.

Ramos first asked what the charges against him were immediately upon his ar-

---

4. The Court explained that an "incriminating response" includes "any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial." *Innis,* 446 U.S. at 301 n. 5, 100 S.Ct. at 1690 n. 5; *see United*

*States v. Quiroz,* 13 F.3d 505, 510 (2d Cir.1993) ("fact that [statement] was meant to exculpate does not make it any less subject to suppression").

rest. He was told only that the charges related to his involvement in the Latin Kings. Later, at FBI Headquarters, Ramos invoked his right to remain silent and his right to counsel. When Ramos again asked what he was being charged with, he was again given only a general response, and he was told "we know you are a Latin King."

The Supreme Court has recognized that such "posit[ing] the guilt" of the person in custody is a technique for eliciting statements from suspects. *See Arizona v. Mauro,* 481 U.S. 520, 526, 107 S.Ct. 1931, 1935, 95 L.Ed.2d 458 (1987); *Innis,* 446 U.S. at 299, 100 S.Ct. at 1688; *Miranda,* 384 U.S. at 450, 86 S.Ct. at 1615. Several courts in this District and elsewhere have held that confronting a suspect with a belief in his guilt is the functional equivalent of interrogation. *See, e.g., United States v. Szymaniak,* 934 F.2d 434, 439 (2d Cir.1991) (confronting defendant with information gathered from interview of another suspect "was calculated to elicit an incriminating response"); *United States v. Brown,* 720 F.2d 1059, 1068 (9th Cir.1983) (accusations of drug selling were equivalent to interrogation); *Henry v. Dees,* 658 F.2d 406, 410 (5th Cir.1981) (confronting defendant with his failure of a polygraph test was "interrogation" under *Innis* ); *United States v. Walker,* 624 F.Supp. 103, 105 (D.Md.1985) ("when the agents showed defendant the [incriminating] document ... only ten minutes after he had invoked his *Miranda* right to counsel, they had to know that such act was reasonably likely to elicit an incriminating response").

In *United States v. Main Street Distributors,* 741 F.Supp. 353, 359 (E.D.N.Y.1990), the Court, presented with facts nearly identical to those here, held that because the agent had posited the suspect's sale of drug paraphernalia, and expressed disapproval of those activities, the defendant's incriminating statements "were made in response to questions or their functional equivalent." Likewise, here, Agent Sullivan elicited a statement from Ramos by positing Ramos' guilty association with the Latin Kings, instead of simply responding to Ramos' question about the charges against him. This additional statement—that the agents knew Ramos was a Latin King—constituted interrogation because it was likely to elicit an incriminating response in the form of an admission or false denial.

The Government relies on *United States v. Cota,* 953 F.2d 753, 758 (2d Cir.1992) for the proposition that an agent's confrontation of a suspect with evidence of guilt in response to the defendant's question about the charges against him does not constitute interrogation. In *Cota,* however, the agent did not expressly "posit the guilt" of the defendant, as did Agent Sullivan and the officers in those cases cited above in which Courts found that officers' statements constituted interrogation. Rather, the agent in *Cota* simply "supplied the defendant with general information regarding the crime she was suspected of committing, in response to her own questions." *Cota,* 953 F.2d at 759 (quoting *United States v. Guido,* 704 F.2d 675, 677 (2d Cir.1983)).

Moreover, the holding in *Cota* was premised on the Court's finding that the agent did not "create an atmosphere whereby his words or actions were 'reasonably likely' to elicit an incriminating response." *Cota,* 953 F.2d at 759. The suspect in *Cota* had been informed of the precise nature of the charges against her. *Cota,* 953 F.2d at 757. Here, the agents' continued refusal to inform Ramos of the precise charges against him helped to create an atmosphere in which the statement "we know you are a Latin King" would be reasonably likely to elicit an incriminating response. *See Glover v. Florida,* 677 So.2d 374 (Fla.Dist.Ct.App.1996) (holding that, under *Innis,* officers' refusal to answer defendants' questions about the charges against him was unduly protracted and evocative such that the atmosphere was tantamount to a custodial interrogation").

◼ Ramos did not waive his rights by asking for information about the charges against him after invoking his rights. The requirement, set forth above, that a defendant must "initiate" discussions with the police in order to waive a previously invoked right is a rigid prophylactic rule that safeguards from police badgering invocations of the Fifth Amendment right to counsel at interrogation, *Edwards,* 451 U.S. at 484–85, 101 S.Ct. at 1884–85, or the Sixth Amend-

ment right to counsel upon the filing of charges, *Michigan v. Jackson,* 475 U.S. 625, 636, 106 S.Ct. 1404, 1411, 89 L.Ed.2d 631 (1986). A similar rule applies where the accused has invoked his Fifth Amendment right to silence. *Mosley,* 423 U.S. at 104, 96 S.Ct. at 326.

Ramos did not, by asking the officers to identify the charges against him, initiate the particular verbal exchange which lead to his statement to the officers. In *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), the Supreme Court explained that some inquiries "are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation." *Id.* at 1045, 103 S.Ct. at 2835. Because a bare inquiry about the charges underlying an arrest relates "to routine incidents of the custodial relationship," it "will not generally 'initiate' a conversation" for purposes of the prophylactic rules. *Id.*

Even if Ramos had initiated a discussion by asking about the charges, the Government nonetheless has not demonstrated that Ramos effected a valid waiver of his rights. The circumstances here indicate that Ramos did not intend a waiver. First, Ramos declined to sign the FBI's waiver-of-rights form. Although a "defendant's refusal to sign a waiver form is not dispositive of the issue," *United States v. Spencer,* 955 F.2d 814, 819 (2d Cir.1992); *see North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979), "the refusal to execute a written waiver may be taken as an indication that no waiver was intended or freely given." *United States v. Boston,* 508 F.2d 1171, 1175 (2d Cir.1974); *e.g., United States v. Heldt,* 745 F.2d 1275, 1277 (9th Cir.1984) ("Heldt's refusal to sign a printed waiver form casts initial doubt on any claim that he waived his *Miranda* right. Most persons attach considerable significance to the refusal to sign."). Moreover, although in police custody for over two hours, Ramos did not engage the officers in a generalized discussion of his case, and was completely unresponsive to Agent Sullivan's express questioning between 10:45 and 10:50 a.m.

Finally, because the Government deliberately elicited the statement at issue, Ramos could not implicitly waive his Sixth Amendment right to counsel. "[O]nce formal criminal proceedings begin, the Sixth Amendment renders inadmissible in the prosecution's case in chief statements 'deliberately elicited' from a defendant without an express waiver of the right to counsel." *Michigan v. Harvey* 494 U.S. 344, 348, 110 S.Ct. 1176, 1179, 108 L.Ed.2d 293 (1990). This court has already held that Agent Sullivan's exchange with Ramos constitute the functional equivalent of interrogation; Ramos' statement was therefore deliberately elicited. The Government does not contend that Ramos expressly waived his constitutional rights. Accordingly, Ramos' statement is inadmissible.

## II. *Ortiz's Consent to the Search of Perez's Room Was Valid*

Perez contends that the fruits of the warrantless search of his father's apartment should be suppressed, as the search was executed without valid consent and therefore violated Perez's Fourth Amendment rights. Perez contends that: (1) Ortiz did not have the requisite authority to consent to a search of Perez's separate bedroom in the apartment, as well as the closets, closed containers and bed within that bedroom; and (2) Ortiz' consent was not voluntary.

"[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court, Eastern District of Michigan,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972). Consequently, the Fourth Amendment embodies a strong preference for search warrants, especially when law enforcement agents seek to enter a private residence. *United States v. Ventresca,* 380 U.S. 102, 106, 85 S.Ct. 741, 744, 13 L.Ed.2d 684 (1965); *McDonald v. United States,* 335 U.S. 451, 455–56, 69 S.Ct. 191, 193–94, 93 L.Ed. 153 (1948).

The Government concedes that it did not have a search warrant for apartment 4H, but contends that the search of Perez's bed-

room was conducted with the valid consent of Perez's father. The Government bears the burden of proving by a preponderance of evidence that that Ortiz had the requisite authority to consent to the full scope of the search the agents conducted, *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968); *United States v. Kon Yu–Leung*, 910 F.2d 33, 41 (2d Cir.1990), and that the consent was voluntary. *United States v. Buettner–Janusch*, 646 F.2d 759, 764 (2d Cir.1981).

## A. Ortiz Had Authority to Consent to the Search of Perez's Bedroom

■ In *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974), the Supreme Court held that third party consent would serve as an exception to the Fourth Amendment's warrant requirement only when that third party was shown by the Government to have "common authority" over the specific area to be searched.

"Common authority" was defined by the Court in *Matlock* as not mere "access," but as "joint access or control [of the area to be searched] for most purposes" and "mutual use" of that "common area." *Matlock*, 415 U.S. at 171 and n. 7, 94 S.Ct. at 993 and n. 7.

The Court of Appeals has interpreted Matlock as follows:

> We have held that a third-party consent will validate the search if two prongs are present: first, the third party had access to the area searched, and second, either: (a) a common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access.

*United States v. Davis*, 967 F.2d 84, 87 (2d Cir.1992) (citing *United States v. Gradowski*, 502 F.2d 563, 564 (2d Cir.1974); *United States v. Trzaska*, 859 F.2d 1118, 1120 (2d Cir.1988)).

■ The question of whether a third party has the authority to consent to a search is "not to be implied from the mere property interest a third party [like Jaime Ortiz] has in the property." *Matlock*, 415 U.S. at 171, n. 7, 94 S.Ct. at 993, n. 7. Rather, it is a multi-factored factual question that turns on

the access, use and reasonable expectations of the parties involved. *Matlock*, 415 U.S. at 171, fn. 7, 94 S.Ct. at 993, fn. 7; *see also Buettner–Janusch*, 646 F.2d at 766.

In *Davis*, the Court of Appeals ruled that a third party's authority to consent to a search of his own footlocker extended to a search of the defendant's closed, but unlocked, metal box stored inside the footlocker. The Court reasoned that, because the third party was the actual possessor of the footlocker, and because the defendant had never prohibited the third party from examining the contents of the box he kept in the footlocker, the defendant assumed the risk that the third party would permit others to search the contents of the box. *See Davis*, 967 F.2d at 88 (citing *Florida v. Jimeno*, 500 U.S. 248, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)).

Perez contends that the agents' brief inquiry, and Ortiz's responses thereto, were insufficient to establish that Ortiz was authorized to consent to a search of Perez's bedroom and the closed containers therein. That inquiry established only that Ortiz rented the apartment and was the sole named tenant on the lease; that his son did not pay rent to him; and that Ortiz had physical access to the defendant's bedroom. While this demonstrated that Ortiz had access to the room, it did not demonstrate that he enjoyed mutual use of the room as required by the Supreme Court in *Matlock*, or that he had common authority over the area, a substantial interest in the area, or permission to gain access, as required by the Court of Appeals in *Davis*.

Perez relies on *Rodriguez*, in which the Supreme Court that law enforcement officials seeking to rely on third-party consent are obliged to make reasonable inquiry to determine whether the third party had authority to consent to a search of another's belongings. *Illinois v. Rodriguez*, 497 U.S. 177, 188, 110 S.Ct. 2793, 2801, 111 L.Ed.2d 148 (1990). Here, however, the fact that Ortiz led the agents into the bedroom and removed Perez's suitcase from the closet therein indicated that Perez had, at a minimum, permission to gain access to the bedroom, as well as to the closed containers therein. Under Davis, such permission confers on the third party the authority to consent to a search.

Moreover, here, as in *Davis,* there is no evidence that Perez ever prohibited his father from examining the contents of the storage bins kept in the closet and the armoire of Perez's bedroom.

Thus, although Perez had been the sole occupant and user of the bedroom for over four years, Ortiz did not use Perez's bedroom for any purpose, and Ortiz had never gone into the "personal, private" boxes and papers in Perez's closets, Ortiz's authority to consent to the full search of the bedroom, nonetheless, rests on the fact that he had permission to enter the room and the closets, as evidenced by his doing so in the presence of the agents.

This Circuit has repeatedly upheld, under the proper circumstances, searches of adult defendants' bedrooms and other private spaces within a home where another occupant of the home consented to the search. *See United States v. Jenkins,* 496 F.2d 57, 72 (2d Cir.1974) (defendant's sister, who occupied one bedroom in his residence, could validly consent to search of defendant's bedroom); *United States v. Cataldo,* 433 F.2d 38, 40 (2d Cir.1970) (finding that defendant's co-tenant, who occupied a separate bedroom in the apartment, could consent to search of entire apartment, noting that where "two or more persons occupy a dwelling place jointly, the general rule is that one joint tenant can consent to a search of the dwelling place"); *United States v. Venizelos,* 495 F.Supp. 1277, 1283–1285 (S.D.N.Y.1980) (owner of home could validly consent to search of bedroom that had been occupied by non-paying guest). The Second Circuit has also held that a defendant's wife could consent to a search of his apartment, even though he was no longer living in the apartment with the defendant. *United States v. Trzaska,* 859 F.2d at 1120.

▇▇▇ Moreover, even if Ortiz lacked actual authority to consent to the search of Perez's room, the search was valid under *Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990), which allows law enforcement officials to rely on a third party's apparent authority to consent to the search, even if it later turns out that he in fact lacked such authority. If a third party does not have actual authority to consent, law enforcement officers may nevertheless rely on his or her consent so long as the "facts available to the officer at the moment ... warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Illinois v. Rodriguez,* 497 U.S. at 188, 110 S.Ct. at 2801; *see, e.g., United States v. Garcia* 56 F.3d 418, 423 (2d Cir.1995) (" 'The Fourth Amendment is satisfied when, under the circumstances, it is objectively reasonable for the officer to believe that the scope of the suspect's consent permitted him to [conduct the search that was undertaken].' ") (quoting *Jimeno,* 500 U.S. at 249, 111 S.Ct. at 1803).

It was reasonable for the agents here to assume that Ortiz had authority to consent, based upon his status as the sole tenant of the apartment and his obvious access to his son's unlocked bedroom and to the unlocked closets and containers therein. It was also reasonable for the FBI agents to believe that Mr. Ortiz's consent extended to items found in closed containers in the closets. The agents presented him with a detailed list of what they were taking, and showed him the contents of the containers. He signed the receipts, and therefore the agents reasonably believed that he was permitting them to seize those items. *See Jimeno,* 500 U.S. at 251, 111 S.Ct. at 1803 (reasonable for police to believe that general consent to search a car extended to containers within that car); *United States v. Snow,* 44 F.3d 133, 135 (2d Cir.1995) (reasonable for officers to assume that consent to search car extended to search of duffel bag and another bag, where neither bag was locked or otherwise secured).

**B. Ortiz's Consent Was Voluntary**

▇▇▇ Perez argues that even if his father had authority to consent to the search of his bedroom, the evidence should be suppressed because the consent was not provided voluntarily. To ascertain whether consent to search is voluntary, courts examine the "totality of the circumstances" to determine whether the consent "was the product of an essentially free and unconstrained choice." *United States v. Oguns,* 921 F.2d 442, 448 (2d Cir.1990) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 225, 93 S.Ct.

2041, 2047, 36 L.Ed.2d 854 (1973)). The touchstone for the validity of consent is an objective standard of reasonableness; accordingly, the subjective state of mind of the person giving consent is irrelevant. *See Garcia,* 56 F.3d at 423 ("'The standard for measuring the scope of a [person's] consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the [person]?'") (quoting *Florida v. Jimeno,* 500 U.S. at 251, 111 S.Ct. at 1803).

The testimony presented at the hearing establish that Ortiz's consent was voluntary. Both Agent Meehan and Agent Arthurs explained to Ortiz that he was free to choose whether to consent to the search or not, and that even if he consented, he could revoke his consent and stop the search while it was in progress.

Ortiz, who spoke and understood English, signed the FBI consent to search form after reading it, and acknowledged at the hearing that he understood what he was doing when he signed the form. The form states, among other things: "This written permission is being given by me to the above-named Special Agents voluntarily and without threats or promises of any kind." The form also acknowledged that Ortiz had "been informed of my constitutional right not to have a search made of the premises hereinafter mentioned without a search warrant and of my right to refuse to consent to such a search."

No agent had his gun drawn after the initial entry into and sweep of the apartment, which lasted only a few minutes. Ortiz was not threatened by any agent, or told that he must consent to the search. After the agents completed the search, they presented Ortiz with a three page receipt describing the items to be seized. Ortiz read the receipt, asked some questions about some of the items, and signed each page after the agents answered his questions and showed him various items at his request.

Ortiz was cooperative and provided the agents with information to help them find the defendant. He told the agents that he be-lieved his son was in Buffalo and might be staying with his grandmother; Ortiz also provided the grandmother's telephone number. Ortiz's poor physical health, depressed mental state, and lack of sleep did not render his consent involuntary. All objective indicia indicated that Ortiz was thinking clearly and knew what he was doing when he consented. *Campaneria v. Reid,* 891 F.2d 1014, 1020 (2d Cir.1989) (finding valid waiver of defendant's Fifth Amendment rights despite fact that defendant was questioned "relentless[ly]" at hospital while suffering from knife wounds in intensive care unit "with tubes running in and out of his body, occasionally complaining of dizziness").

■ Ortiz contends that he was coerced into consenting because he was told the agents would get a search warrant if he did not consent to the search should be rejected. Agent Meehan informed Ortiz that the agents would try to obtain a search warrant if he refused to consent.[5] However, informing a person that absent consent, a search warrant will be obtained does not render consent to search involuntary. *See, e.g., United States v. White,* 979 F.2d 539 (7th Cir.1992); *United States v. Colonia,* 870 F.2d 1319 (7th Cir.1989). Finally, Ortiz was informed by at least two agents that he was free to refuse consent, and he read and signed a form advising him of his rights and stating that he was not coerced in any way.

### Conclusion

For the reasons set forth above, Ramos' motion is hereby granted and Perez's motion is hereby denied.

It is so ordered.

---

**5.** Ortiz testified that one of the female agents told him "they didn't have a search warrant but—it doesn't make a difference" and that he felt that he had no choice about whether to consent.